# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CORNERSTONE THERAPY**<br>**SERVICES, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:16CV00018 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **RELIANT POST ACUTE CARE**<br>**SOLUTIONS, LLC, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Mary Foil Russell and Kenneth R. Russell, Jr., Russell Law Firm, Bristol, Virginia, for Plaintiff; Gary L. Edwards and Ronald S. Range, Jr., Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Johnson City, Tennessee, for Defendants.*

In this civil case invoking the court's diversity jurisdiction, the plaintiff asserts claims of breach of contract, tortious interference with business expectancy, violation of the Virginia Trade Secrets Act, and violation of certain federal healthcare laws. The defendants have moved to dismiss the Amended Complaint. I find that the Amended Complaint adequately pleads a claim of breach of contract, and I will deny the Motion to Dismiss as to that count. However, because I find that the other counts of the Amended Complaint fail to state claims upon which relief can be granted, I will grant the defendants' Motion to Dismiss as to the remaining claims.

I.

The Amended Complaint alleges the following facts, which I must accept as true for purposes of deciding the Motion to Dismiss.

Plaintiff Cornerstone Therapy Services, Inc. ("Cornerstone"), a Tennessee corporation with its principal offices in Pennington Gap, Virginia, provides physical and occupational therapy to home health agencies and physical, occupational, and speech therapy to skilled nursing facilities. Dwayne Steven Garrett is the President of Cornerstone and is also a shareholder.

Until recently, Cornerstone employed approximately 28 licensed therapists who provided physical, occupational, and speech therapy to patients of Abingdon Health & Rehab Center, LLC ("Abingdon Health & Rehab") and SP Lee LLC d/b/a Lee Health & Rehab ("Lee Health & Rehab"). Both Abingdon Health & Rehab and Lee Health & Rehab are owned by Commonwealth Care of Roanoke ("CCR"). Beginning in 2010, Cornerstone had a contract with CCR to provide therapy services at Lee Health & Rehab. Since 2014, Cornerstone had a contract with CCR to provide therapy services at Abingdon Health & Rehab. Cornerstone's contracts with Abingdon Health & Rehab and Lee Health & Rehab were automatically renewable for one-year terms but could be terminated by either party upon written notice of nonrenewal ninety days prior to the end of a term.

Reliant Post Acute Care Solutions, LLC, is a Delaware limited liability company with principal offices in Texas.  Reliant Medical Management, LLC is a Delaware corporation, as is Reliant Rehabilitation Holdings, Inc.  These three entities do business as Reliant Post Acute Care Solutions ("Reliant").  Reliant provides therapy services in skilled nursing facilities.  Joe McDonough is Reliant's Chief Executive Officer, and Robert W. Harrington, M.D., is the Chief Medical Officer.  Louis Collier is the Vice President of Post-Acute Networks at Reliant.

Wellmont Health Systems ("Wellmont") is a healthcare provider that provides hospital and other services in northeast Tennessee and southwest Virginia.  Mountain States Health Alliance ("MSHA") is also a healthcare organization that provides hospital and other services in northeast Tennessee, southwest Virginia, southeast Kentucky, and western North Carolina.

The Centers for Medicare and Medicaid Services ("CMS") of the United States Department of Health and Human Services regulates the provision of health care services.  CMS has adopted regulations designed to reduce the number of patients readmitted to hospitals after being discharged.  The changes largely focus on services provided after a patient's discharge from a hospital, known as post-acute care.  Post-acute care providers include long-term care hospitals, skilled nursing facilities, home health agencies, and inpatient rehabilitation facilities.

In October, 2014, Congress enacted the Improving Medicare Post-Acute Care Transformation Act ("IMPACT"). IMPACT standardized assessments for critical care issues across the spectrum of post-acute care providers and required reporting of certain data to ensure that patient care is delivered based on what the patient needs and to reduce unnecessary in-patient delays. IMPACT incorporates standardized assessment and public reporting of quality measures. To satisfy the CMS requirements for post-acute care, a hospital must either create and manage its own network of post-acute care providers or contract with another entity to provide the coordination of post-acute care. These coordination entities are commonly known as PAC networks.

In 2014, Collier was employed by Wellmont, and his duties included implementing a PAC network. Collier approached Garrett about Cornerstone becoming a part of the Wellmont PAC network. Collier later began working for Reliant. On behalf of his new employer, Collier approached Garrett and indicated that Reliant was interested in purchasing Cornerstone. Cornerstone and Reliant began negotiations for the purchase of Cornerstone by Reliant and exchanged emails, voice and text messages, and other written correspondence about the potential purchase.

In August, 2014, Collier and McDonough, representing Reliant, met with Garrett and Ella Sue Daugherty, the other shareholder of Cornerstone, and her

husband Jim Daugherty, to discuss the contemplated sale of Cornerstone to Reliant. At the meeting, McDonough expressly represented that Reliant would purchase Cornerstone and that a Letter of Intent ("LOI") was forthcoming. McDonough further expressly confirmed that in the event the sale was not completed, Reliant would not solicit Cornerstone's business or contracts. The parties concurred that the purchase price would be $4,000,000, an amount based on the industry standard of five to six times Cornerstone's annual revenue plus the cost of recruiting therapists.

As part of the negotiations, Cornerstone requested a non-disclosure agreement ("NDA"). Reliant produced a proposed agreement and with minimal modifications, the parties executed the NDA. In the NDA, Reliant agreed that it would not use Cornerstone's confidential information "directly or indirectly, for any purpose other than the evaluation or undertaking of the Proposed Relationship." (Am. Compl. Ex. C ¶ 2, ECF No. 35-3.) More specifically, the NDA provides:

> Each Party agrees that during the term of this Agreement and for a period of two years from the date of this Agreement, except per the terms of a specific written consent of the other Party, neither Party, nor any of its Representatives on its behalf, will directly or indirectly (i) use Confidential Information for any purpose, including any competitive or commercial purpose, other than the Business Purpose, or (ii) solicit for employment or engagement or hire or engage any director, manager, officer, or managerial-level employee of the other Party with whom it has had contact or who became known to it in connection with consideration of the Proposed Relationship, except

- 5 -

that neither Party will be precluded from engaging in general solicitations of employment not specifically directed at employees of the other Party or hiring any employee who responds to such general solicitation or has terminated employment with the other Party at least six months prior to the date of such Party's solicitation of such employee.

(*Id.* ¶ 4.) The NDA defines "Confidential Information" as follows:

> For purposes of this Agreement, "Confidential Information" means any information, data or know-how, whether in oral, written or electronic form, that is not available to the general public or is otherwise confidential or proprietary in nature, whether furnished before or after the date hereof, and all copies of, extracts from, analyses and other materials based on, containing or otherwise reflecting such information, that is disclosed by the Disclosing Party to the Receiving Party or is otherwise learned by the Receiving Party in the course of its discussions or business dealings with, or its physical or electronic access to the premises of, the Disclosing Party. . . . Confidential Information shall not include any information, data or know-how that: (i) is or becomes publicly available other than as a result of a violation of the Agreement, (ii) is or becomes available to Receiving Party through lawful receipt from a third party not prohibited from disclosing such information by a legal, fiduciary or contractual obligation to the Disclosing Party, or (iii) was within the Receiving Party's possession prior to it being furnished to the Receiving Party by or on behalf of the Disclosing Party or (iv) is independently developed by the Receiving Party without reference to or use or disclosure of the Disclosing Party's Confidential Information.

(*Id.* ¶ 1.)

Following execution of the NDA, Cornerstone provided Reliant a list of Cornerstone's clients and other confidential information important to the operation of Cornerstone, including information about the contracts between Cornerstone and CCR. Cornerstone provided the type of patients at each facility by discipline,

- 6 -

the percentage of patients covered by Medicate Part A and Part B, profit and loss information for the CCR contracts, and pricing provisions.

Reliant requested additional information from Cornerstone through 2015. Relying on the promise of an LOI, Cornerstone complied with the requests for information and continued to negotiate with Reliant. In January, 2016, Collier again stated that an LOI was forthcoming. In the spring of 2016, Cornerstone learned that Reliant had approached CCR about entering into a contract to provide therapy services at Abingdon Health & Rehab. Cornerstone told McDonough that it considered Reliant's negotiations with CCR to be a breach of the NDA. Counsel for Cornerstone then sent a letter to Harrington, Reliant's Chief Medical Officer, about certain violations of the NDA. On May 18, 2016, Cornerstone received a short response from Reliant's counsel stating that Reliant conducted its business lawfully.

On June 1, 2016, CCR called Garrett to inform him that CCR was cancelling the Cornerstone contract at Abingdon Health & Rehab and that Reliant would be providing PAC services at that facility. On June 3, 2016, Cornerstone received written notice from CCR that it was terminating the Abingdon Health & Rehab contract with Cornerstone, which expired on September 3, 2016. On June 22, 2016, Cornerstone received a 90-day written notice from CCR that it was

cancelling the Cornerstone contract at Lee Health & Rehab. The Lee Health & Rehab contract expired on or about September 22, 2016.

In August, 2016, Reliant held meetings with Cornerstone employees to solicit them to work for Reliant. Beginning in September, 2016, Reliant hired all managerial-level employees of Cornerstone who had been working at Abingdon Health & Rehab.

Cornerstone alleges that Reliant used its client list to target certain skilled nursing facilities in southwest Virginia, and that it used Cornerstone's rate structure, pricing information, profit and loss information, and patient type information to negotiate contracts with CCR at Abingdon Health & Rehab and Lee Health & Rehab. According to Cornerstone, these actions violated the NDA and caused monetary damage to Cornerstone. Cornerstone also alleges that Reliant's solicitation and hiring of Cornerstone's managerial and supervisory employees breached the NDA. Cornerstone contends that Reliant acted willfully and fraudulently, damaging Cornerstone to the tune of $4,000,000 by diminishing the value of its business.

Cornerstone also asserts a claim of tortious interference with business relationship. It alleges that Reliant knew of Cornerstone's ongoing business relationship and reasonable expectancy of continued business with CCR, and that Reliant intentionally interfered with that relationship. Cornerstone alleges that

Medicare and Medicaid surveys had not identified any deficiencies requiring a plan of correction for therapy services provided at Lee Health & Rehab or Abingdon Health & Rehab during the three years that Cornerstone provided services at those facilities. Before issuance of the 90-day termination letters, CCR had never notified Cornerstone of any dissatisfaction with its therapy services. Cornerstone alleges that Reliant improperly interfered with the ongoing business relationship between CCR and Cornerstone by falsely stating Reliant's connection to MSHA and by misstating Reliant's role in continuing patient referrals to Abingdon Health & Rehab and Lee Health & Rehab. Cornerstone claims that Reliant falsely represented that Reliant's services reduced re-hospitalizations and that Reliant managed patient care more effectively and efficiently than Cornerstone. Cornerstone also alleges that Reliant falsely claimed that its software was necessary or advantageous in receiving patient referrals from MSHA. Cornerstone claims that Reliant's tortious interference damaged Cornerstone in the amount of $4,000,000 by diminishing Cornerstone's value.

Cornerstone further asserts a claim of violation of the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336 ("VUTSA"). According to Cornerstone, its rates received from skilled nursing facilities and the formula for establishing its rates are trade secrets under the VUTSA. Cornerstone alleges that it took reasonable steps to protect these trade secrets from unauthorized disclosure and

that Reliant appropriated them under the false pretense of an intended acquisition. Cornerstone claims that Reliant's misappropriation of its trade secrets was willful and malicious, and it seeks punitive damages and attorney fees.

Finally, Cornerstone claims that Reliant has violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), and a federal Medicare regulation, 42 C.F.R. § 482.13(b)(1),(2). Cornerstone alleges that Reliant has either acted as the contracting agent to operate the PAC network for all MSHA hospitals or has misrepresented itself as MSHA's agent for the PAC network. Johnston Memorial Hospital in Abingdon, Virginia, is affiliated with MSHA and is part of the PAC network operated by Reliant. Cornerstone avers that Reliant has exchanged software or management services for referrals from the MSHA PAC network. Abingdon Health & Rehab receives most of its referrals of patients from Johnson Memorial Hospital through MSHA's PAC network. According to Cornerstone, Reliant's arrangement with Johnston Memorial Hospital and MSHA violates federal statutes and regulations governing a patient's choice of care and unlawful remuneration or kickbacks.

The defendants have moved to dismiss the Amended Complaint.[1] The motion has been fully briefed and is ripe for decision.[2] For the reasons that follow, the Motion to Dismiss will be granted in part and denied in part.

## II.

In order to survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by

---

[1] The defendants moved to dismiss the original Complaint, and the plaintiff then filed an Amended Complaint as permitted by Fed. R. Civ. P. 15(a)(1). The plaintiff also filed a brief in opposition to the Motion to Dismiss, and the defendants filed a reply brief in support of the Motion to Dismiss the Complaint. Procedurally speaking, the defendants did not properly respond to the Amended Complaint within 14 days as required by Fed. R. Civ. P. 15(a)(3). However, in the interests of justice, I indicated that I would treat the Defendants' Reply to Plaintiff's Response to Defendants' Motion to Dismiss (ECF No. 40) as a timely Motion to Dismiss the Amended Complaint. I granted the plaintiff leave to file a reply, which it did. (ECF No. 41.)

[2] I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

factual allegations." *Id*. at 679. Although a complaint need not contain detailed factual allegations, it must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## A. BREACH OF CONTRACT CLAIM.

The defendants argue that the Amended Complaint does not state a plausible breach of contract claim because there are no alleged facts showing that Reliant used Cornerstone's confidential information for purposes other than considering the potential acquisition. The defendants also contend that the Amended Complaint does not state facts showing that improper use of Cornerstone's information was the proximate cause of CCR's termination of its contracts with Cornerstone. Cornerstone responds that the NDA specifically defines Cornerstone's customer list as confidential information, and it is plausible that Reliant used the customer list and related financial information to decide which facilities it would target. Cornerstone also argues that it has adequately alleged that the defendants violated the NDA by soliciting and hiring Cornerstone's managerial employees.

To state a claim of breach of contract under Virginia law, a complaint must allege facts showing: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or

damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016) (internal quotation marks and citations omitted). Ultimately, "a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted." *Id.*

Regarding the alleged use of confidential information, Cornerstone's allegations do not rise above speculation and are insufficient to survive the defendants' Motion to Dismiss. Cornerstone generally alleges that Reliant used Cornerstone's rate structure, pricing information, patient type information, and profit and loss information to negotiate contracts with CCR, but these allegations are unsupported by any facts and appear to be little more than suspicions. Cornerstone essentially argues that because Reliant had access to confidential information and then entered into contracts with CCR, it must have used the confidential information to negotiate the contracts. There are no factual allegations regarding who contacted whom, when, or what was stated. The letters from Abingdon Health & Rehab and Lee Health & Rehab giving Cornerstone notice that the contracts would not be renewed stated that the facilities were "moving towards a relationship with [Reliant] for the purpose of reducing re-hospitalizations and managing patient care more effectively and efficiently." (Am. Compl. Ex. F, G, ECF Nos. 35-6, 35-7.) This explanation does not rest upon any use of confidential

financial information. Therefore, I will dismiss the breach of contract claim as it pertains to the alleged improper use of confidential information.

The claim based on the nonsolicitation provision, however, is another matter. The NDA prohibits the defendants from "solicit[ing] for employment or engagement or hir[ing] or engage[ing] any director, manager, officer, or managerial-level employee of" Cornerstone "with whom it has had contact or who became known to it in connection with consideration of" the potential purchase of Cornerstone. (Am. Compl. Ex. C ¶ 4, ECF No. 35-3.) An exception exists for "general solicitations of employment not specifically directed at employees of [Cornerstone] or hiring any employee who responds to such general solicitation or has terminated employment with [Cornerstone] at least six months prior to the date of [Reliant]'s solicitation of such employee." *Id.*

The Amended Complaint alleges that "Reliant held meetings of Cornerstone employees for the purpose of soliciting their employment" and that "Reliant hired all managers and managerial-level employees of Cornerstone who were working at Abingdon Health & Rehab" and at Lee Health & Rehab. (Am. Compl. ¶¶ 50-52, ECF No. 35.) These allegations state a claim for breach of the NDA. The defendants have not argued that the nonsolicitation provision is unenforceable, and Cornerstone has alleged facts which, if true, may show that Reliant breached the

- 14 -

NDA and caused harm to the plaintiff. Therefore, I will deny the Motion to Dismiss as it relates to the alleged breach of the NDA's nonsolicitation provision.

## B. TORTIOUS INTERFERENCE CLAIM.

The defendants contend that Cornerstone's tortious interference claim is not plausible because the alleged facts do not show that Reliant's asserted use of confidential information caused the termination of the Abingdon Health & Rehab and Lee Health & Rehab contracts.

Under Virginia law, the elements of tortious interference with business expectancy are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014) (internal quotation marks and citations omitted). Here, because the contracts with CCR could be terminated with proper notice and there was no guarantee of renewal, Cornerstone must also allege that the defendant employed improper methods. *Id.* "[I]nterference is considered 'improper' if it is illegal, independently tortious, or violates an established standard of trade or profession." *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011). "Improper methods may include violence, threats or

- 15 -

intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship," as well as "[s]harp dealing, overreaching, or unfair competition." *Id.* (internal quotation marks and citation omitted).

I agree with Reliant that Cornerstone has not alleged sufficient facts to state a claim of tortious interference with business expectancy. As with the breach of contract claim related to use of confidential information, Cornerstone relies on speculation and does not allege facts showing that Reliant improperly used Cornerstone's confidential information or that such use caused CCR not to renew the contracts for Abingdon Health & Rehab and Lee Health & Rehab. The fact that CCR terminated its contracts with Cornerstone and entered into contracts with Reliant is not enough. Cornerstone contends that Reliant made false statements to CCR but does not allege who made the statements, to whom, or when. These allegations, too, are no more than speculative conclusion. Without more, Cornerstone will not be permitted to proceed to discovery with the hope of uncovering some evidence in support of its claim. I will grant the Motion to Dismiss with respect to the claim of tortious interference.

### C. VUTSA CLAIM.

The defendants contend that the VUTSA claim must be dismissed because the kinds of information identified as trade secrets in the Amended Complaint do

not qualify as trade secrets under the VUTSA, and the Amended Complaint does not state facts showing that the information was misappropriated. The defendants argue that pricing information has no independent economic value and matters only to the parties to the particular contract at issue. The pricing information is not secret, according to the defendants, because the other parties to the contract had knowledge of it. The defendants also point to the fact that CCR did not solicit competitive bids for the contract.

Cornerstone counters that its profit and loss statements, patient type information, and rate calculation formula all amount to trade secrets under VUTSA. Moreover, argues Cornerstone, pricing information is always valuable to an entity seeking to negotiate a contract with a customer of a competitor.

The VUTSA entitles an owner of trade secrets to damages when those trade secrets are misappropriated, causing loss to their owner or unjust enrichment of the misappropriator. Va. Code Ann. § 59.1-338. A trade secret is defined as:

> information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code Ann. § 59.1-336. Misappropriation includes:

Disclosure or use of a trade secret of another without express or implied consent by a person who

. . . .

b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

. . . .

(2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .

*Id.*

Assuming without deciding that the pieces of information identified by Cornerstone are trade secrets under VUTSA, Cornerstone has not alleged sufficient facts showing that Reliant used or disclosed its trade secrets. The factual averments are insufficient to show misappropriation; thus, I will grant the Motion to Dismiss as it pertains to the VUTSA claim.

## D. VIOLATION OF FEDERAL LAW.

The defendants urge dismissal of the plaintiff's claim based on federal law because the federal Anti-Kickback Statute is a criminal statute that does not provide a private right of action. Moreover, the defendants argue, the claim has not been stated with sufficient particularity.

Cornerstone asserts that although the Anti-Kickback Statute is a criminal statute, it can bring a civil *qui tam* action under the False Claims Act ("FCA"), 31

- 18 -

U.S.C. § 3730. Cornerstone has not complied with the statutory requirements for bringing a *qui tam* action. For example, a civil *qui tam* action must be "brought in the name of the Government." 31 U.S.C. § 3730(b). Nevertheless, I will consider whether Cornerstone's claim would be viable had it satisfied all of the statutory *qui tam* requirements.

Violations of the Anti-Kickback Statute constitute false or fraudulent claims under the FCA, 42 U.S.C. § 1320a–7b(g), and claims brought under the FCA must be pleaded with the heightened particularity required by Rule 9(b) of the Federal Rules of Civil Procedure, *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432 (4th Cir. 2015). The Fourth Circuit has stated that a plaintiff asserting an FCA claim "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (internal quotation marks and citations omitted).

> Rule 9(b) plays an especially important role in the context of FCA *qui tam* actions. For one thing, the complaint must give the government adequate information about the nature of the suit to investigate and decide whether to intervene. . . . For another, a *qui tam* plaintiff, who has suffered no injury in fact, may be particularly likely to file suit as a pretext to uncover unknown wrongs.

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731–32 (4th Cir. 2010) (internal quotation marks and citations omitted).

Cornerstone alleges that "[o]n information and belief, Reliant has exchanged software or management services for referrals from the MSHA PAC networks." (Am. Compl. ¶ 91, ECF No. 35.) No further facts are stated to bolster this claim, and it is entirely speculative. Cornerstone asks me to allow its claim to proceed and indicates that it will seek leave to amend its claim after obtaining more information in discovery. This is simply a request for a fishing expedition, which is not the purpose of discovery. Cornerstone has not alleged its purported *qui tam* claim under the Anti-Kickback Statute with the required particularity, and the claim must be dismissed.

Cornerstone also alleges that Reliant has violated the patients' rights provisions articulated in 42 C.F.R. § 482.13(b)(1),(2). The Medicare regulation cited by Cornerstone does not create any private right of action; it merely sets forth requirements for providers to participate in Medicare. *See, e.g.*, *Pantaleo v. Hayes*, No. 08 C 6419, 2013 WL 5311450, at *5 n.13 (N.D. Ill. Sept. 20, 2013); *Smith v. Univ. of Minn. Med. Ctr. – Fairview Riverside*, Civil No. 09–293 (JRT/JSM), 2010 WL 3893902, at *16 (D. Minn. July 14, 2010). To the extent that the final count of the Amended Complaint rests upon the cited regulation, that claim must be dismissed.

III.

For the foregoing reasons, it is **ORDERED** that the Defendants' Reply to Plaintiff's Response to Defendants' Motion to Dismiss, treated as a Motion to Dismiss (ECF No. 40) is GRANTED IN PART and DENIED IN PART. The motion is denied as to the claim alleging breach of the nonsolicitation provision of the NDA. The motion is granted as to all other claims in the Amended Complaint.

ENTER: November 21, 2016

/s/ James P. Jones
United States District Judge